HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MATTHEW BRAUN; individually, and ANN LISA BRAUN, individually, and as Personal Representative of the Estate of MAXWELL BRAUN,<br><br>　　　　　　　Brauns,<br><br>　　v.<br><br>CROWN CRAFTS INFANT PRODUCTS INC., a Delaware Corporation<br><br>　　　　　　　Defendant. | CASE NO. C12-5811 RBL<br><br>ORDER DENYING CROWN CRAFTS' *DAUBERT* MOTION, DENYING CROWN CRAFTS' MOTIONS FOR SUMMARY JUDGMENT, AND GRANTING BRAUNS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>[Dkt. #46, #48, and #51] |

## I.　INTRODUCTION

This matter is before the Court on Defendant Crown Crafts Infant Products, Inc.'s Motion To Exclude Medical Causation Testimony of Dr. Kiesel (Dkt. #51), Crown Crafts' Motions for Summary Judgment (Dkt. #48), and Matthew, Lisa, and Mawell Brauns' Motion for Partial Summary Judgment (Dkt. #46).

Dr. Kiesel is the Braun's medical causation expert. Crown Crafts claims that Dr. Kiesel improperly applied the differential diagnosis method to opine that Maxwell died of asphyxiation. Review of Dr. Kiesel's Deposition, Report, and Declaration reveals that his methodology is reliable and that his testimony is relevant. He properly applied the differential diagnosis method

ORDER - 1

by considering possible known and unknown causes and eliminated each to ultimately conclude that Maxwell's probable cause of death was asphyxiation. Crown Crafts' *Daubert* Motion is therefore DENIED.

Crown Crafts' Motion for Summary Judgment presumes that its motion to exclude Dr. Kiesel would be granted. Crown Crafts argues that the Brauns cannot establish the causation elements of their claim without Dr. Kiesel's testimony. Crown Crafts also argues that the Brauns have failed to establish a factual basis to prove punitive damages. Because this Court denies Crown Crafts' *Daubert* Motion, and because the assessment of punitive damages is left exclusively to the jury, Crown Crafts' Motion for Summary Judgment is DENIED.

The Brauns have moved for judgment as a matter of law on all of Crown Crafts' affirmative defenses. Crown Crafts concedes that the Brauns are entitled to summary judgment on all but one of their affirmative defenses. Because the one affirmative defense that Crown Crafts challenges is not actually an affirmative defense, the Brauns' Motion for Partial Summary Judgment is GRANTED.

## II. BACKGROUND

The Court's prior Order Denying Defendant's Motion for Summary Judgment (Dkt. #38) provided a detailed depiction of the events surrounding Maxwell Braun's death. (Dkt. #28, 2-3.) An abbreviated portion of the relevant facts pertaining to this Order are stated below.

Crown Crafts is a corporation incorporated in Delaware. Its principle place of business is in Compton, California. Crown Crafts manufactures consumer infant and toddler products. It designs its products in California, manufactures them in China, and markets and sells them through retail stores nationwide. One of Crown Crafts products includes the "NoJo—The Original Baby Sling."

ORDER - 2

The Brauns live in Virginia, where they purchased a NoJo. In December 2005, the Brauns drove to Connecticut to visit family and friends for the holidays. While at a friend's house, Mrs. Braun placed Maxwell in the NoJo. Approximately 10–15 minutes later, she found Maxwell unresponsive and not breathing. Maxwell was later pronounced dead at the Norwalk Hospital in Norwalk, Connecticut. The death certificate listed the cause of death as "pending further studies."

In May 2006, Connecticut's Chief Medical Examiner sent a letter to the Brauns stating that the "[r]esults of our examination of your child indicates that the cause of death is Sudden Infant Death Syndrome (SIDS or 'Crib Death'). (LeBank Decl., Ex. G, Dkt. 33.) In March 2010, the U.S. Consumer Product Safety Commission ("CPSC") published a news release entitled "Infant Deaths Prompt CPSC Warning About Sling Carriers for Babies." (LeBank Decl., Ex. H, Dkt. 33.) The next day, Mrs. Braun contacted CPSC to report Maxwell's death. CPSC issued another statement describing the link between infant slings and asphyxiation in November 2010. Mrs. Braun contacted the Connecticut Medical Examiner asking if he had changed his conclusion about Maxwell's death. In August 2011, the Examiner wrote Mrs. Braun and restated his original conclusion that Maxwell died of SIDS. In late 2011 or early 2012, Mrs. Braun learned of another mother whose child had died while in a NoJo sling. Mrs. Braun talked with the mother and then contacted an attorney who set up a meeting with a forensic pathologist, Dr. Kiesel, in May 2012.

Dr. Kiesel, M.D., Ph.D. is a diplomate of the American Board of Pathology in Anatomic and Forensic Pathology with over twenty years of experience as a certified forensic pathologist. He has held multiple teaching positions and has published numerous articles on pathology issues. In this case, Dr. Kiesel claims to have utilized the differential diagnosis to opine that the most

ORDER - 3

probable cause of Maxwell's death was asphyxiation. Dr. Kiesel has described in his report, deposition, and declaration the methods that he used to reach that conclusion. He first reviewed all of the available evidence in Maxwell's case to obtain a general understanding of the events. He then reviewed similar cases of infant sling deaths and relevant literature to discover common themes. Literature that Dr. Kiesel relied on includes CPSC Press Releases and Warnings, American Academy of Pediatrics reports, and other academic articles on harmful seating positions for infants and the correlation between SIDS and asphyxia.

Finally, he applied his findings to Maxwell's case. Dr. Kiesel claims that he eliminated each possible cause of death until only the most probable cause remained, asphyxiation. In addition to asphyxiation, the different possible causes of death that Dr. Kiesel considered are infectious processes, cardiac arrhythmia and dysrhymia problems, metabolic causes, hypothermia, and unknown diseases.

### III. DISCUSSION

#### A. Crown Crafts' *Daubert* Motion

Crown Crafts argues that Dr. Kiesel failed to properly utilize the differential diagnosis. The Brauns argue that Dr. Kiesel properly engaged in the differential diagnosis in his consideration of the various possible alternative causes of death.

##### 1. FRE 702 / *Daubert* Standard

Under Fed. R. Evid. 702, a qualified expert can offer an opinion if he bases his opinion on "sufficient facts or data" and "reliable principles and methods", applies the principles and method's to the case's facts, and assist the trier of fact's understanding of the evidence or determination of a fact. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 588 (1993). District court judges serve as gatekeepers in ensuring that expert testimony is both

ORDER - 4

relevant and reliable. *See Daubert*, 509 U.S. at 589; *Estate of Barabin v. AstenJohnson, Inc.*, 2014 U.S. App. LEXIS 774 (9th Cir. 2014) (en banc).

An Expert's testimony must be grounded upon "a reliable basis in the knowledge and experience of the relevant discipline." *Estate of Barabin*, 2014 U.S. App. 774 , at *12 (en banc). Ultimately, reliability depends on scientific validity. *Daubert*, 509 U.S. at 590. Relevant factors in determining the reliability of an expert's scientific theory include, but are not limited to, testing, peer review, error rates, and acceptability of the relevant scientific community. *Kumho*, 526 U.S. at 141. However, such factors do not constitute a definitive checklist and the gate keeping inquiry must be tied to particular facts. *See Daubert* , 509 U.S. at 597; *Kumho*, 526 U.S. at 137-38. Importantly, the court's focus is on the soundness of the expert's methodology, not the correctness of the expert's conclusions. *Estate of Barabin*, 2014 U.S. App. 774 , at *12 (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).

### 2. The Differential Diagnosis Method

Dr. Kiesel claims that he used the differential diagnosis method to reach his conclusions. The differential diagnosis method is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)). Properly-conducted differential diagnoses are considered reliable and are admissible under *Daubert*. *Id*.

In conducting a differential diagnosis, experts should form a comprehensive list of hypotheses. *Id*. Experts then thoroughly review the evidence to eliminate the hypotheses until the most probable one remains. *Id.* at 1058. The eliminations must be grounded on scientific methods and procedures and not solely based on "subjective beliefs or unsupported speculation." *Id*. (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 449, 502 (9th Cir. 1994)). If an expert

ORDER - 5

relies on objective, verifiable evidence in reaching a conclusion, his testimony is admissible even if a direct causal relationship has not been conclusively established between the product and the harm. *Id.* at 1059 (citing *Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998)).

### 3. Kiesel Properly Employed The Differential Diagnosis

Crown Crafts contends that Dr. Keisel failed to properly apply the differential diagnosis and that he based his opinion on personal belief rather than credible evidence. However, these claims directly contradict the record.

Crown Crafts first argues that Dr. Kiesel failed to consider all of the potential causes of death because he did not consider "unknown" causes. Contrary to Crown Crafts' argument, Dr. Kiesel specifically claims in his deposition (Dep. pg. 67-68) that he did consider unknown causes:

> There are things that are unknown and we just can't test for. But this, again, is the practice in pathology, is very often the immediate cause of death is unknown. . . . In the case of an infant, if you've ruled everything else out, yes, there can always be something else that it might be that we just can't test for now. But you have to go based on the evidence that you've got. And if the preponderance of evidence is suggesting that this is a hostile sleep environment that the child is in and, again, as you've got lots of examples of that, or at least 30 examples of that, then I think it's a reasonable diagnosis that that is the most probable reason the infant is dying.

Dr. Kiesel based his decisions to eliminate alternate causes of death on more than "subjective beliefs or unsupported speculation." He considered all of the available evidence, reviewed literature focused on infant asphyxiation and hostile sleeping environments, and considered both known and unknown possible causes of death. Alternate causes that he considered included hypothermia, cardiac arrest, trauma, poisonings, and sudden infant death

ORDER - 6

syndrome (SIDS).[1] He then eliminated potential causes based on its likelihood of occurrence. Dr. Kiesel appropriately used "scientific methods and procedures."

Crown Crafts next argues that Dr. Kiesel's statements constitute an unsupported, personal opinion. Again, a review of Dr. Kiesel's statements directly contradicts this argument. In his Deposition, Dr. Kiesel confirmed that he examined CPSC cases of deaths in similar situations, literature and warnings from the CPSC and the American Pediatric Associations regarding the hazards of soft slings and their forced recalls. He was not able to cite specific studies on the direct correlation between slings and asphyxiation, but he explained that such studies would constitute a serious breach of ethics. Dr. Kiesel's testimony is admissible despite the lack of direct evidence of causation because he relied on other verifiable evidence. Furthermore, as the Brauns correctly note, epidemiological studies are not required in order to form an opinion. *Intalco Aluminum v. Dep't of Labor & Idust.*, 66 Wn. App. 644, 660-62 (1992) (quoting *Ferebree v. Chevron Chem. Co.*, 736 F.2d 1529 (D.C. Cir. 1984)).

Dr. Kiesel relied on a diversity of resources and properly applied a commonly accepted scientific method to arrive at his conclusion. Accordingly, the Court finds that Dr. Kiesel's testimony is reliable and relevant. Crown Crafts' *Daubert* Motion is DENIED.

### B. Motions for Summary Judgment

#### 1. Summary Judgment Standard

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to

---

[1] Notably, SIDS only applies in the absence of other explanations.

ORDER - 7

interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

## 2. Crown Crafts' Motions for Summary Judgment

Crown Crafts' Motion is based on the assumption that its *Daubert* Motion would be granted and that Dr. Keisel's testimony would be excluded. It argues that the Brauns have no evidence to establish the causation element of their claim.

Because the *Daubert* Motion is denied, Crown Crafts' Motion for Summary Judgment on Causation is DENIED.

Crown Crafts also seeks summary judgment on the Braun's punitive damages claim, arguing that the Brauns have not produced evidence that would support a punitive damages award.

As an initial matter, the parties dispute which state's punitive damages law applies. A federal court, sitting in diversity, must apply "the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). Washington has adopted the Restatement (Second) of Conflict of Laws and engages in a conflict of law analysis for each issue. *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137 (Wash. Ct. App.

ORDER - 8

2009). This Court has previously analyzed the choice of law for the issue of product liability, and now must do so for the punitive damages issue. (Dkt. #38.)

Washington courts will engage in a conflict of laws analysis only when there is an actual conflict between the laws or interests of Washington and the laws or interests of another state. *Burnside v. Simpson Paper Co.*, 123 Wash.2d 93, 100–01 (1994). Both parties agree that an actual conflict exists between the punitive damage laws of the interested states.

### a. California Possesses the Most Significant Contacts for Punitive Damages

Once an actual conflict of law is established, Washington applies the Restatement (Second) of Conflict of Laws § 145 "most significant relationship" test to determine which substantive law to apply. The factors that determine the most significant relationship include the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile, residence, and nationality, place of incorporation and place of business parties, and place where the relationship between the parties is centered. *Restatement (Second) of Conflict of Laws § 145 (1971); Johnson v. Spider Staging Corp.*, 87 Wash.2d 577, 580 (1976).

The court must evaluate the contacts both quantitatively and qualitatively, based upon the location of the most significant contacts as they relate to the particular issue at hand. *Martin v. Goodyear Tire & rubber Co.*, 114 Wn. App. 823, 830 (2003). The court analyzes the contacts with each potentially interested state according to their relative importance. "[The court's] approach is not merely to count contacts, but rather to consider which contacts are most significant and to determine where these contacts are found." *Johnson*, 87 Wn.2d at 581.

The conflict-of-law analysis for punitive damages remains largely the same as the previously conducted conflict-of-law analysis for products liability, because the facts analyzed under each Restatement factor for the two issues remain the same. However, when evaluating

ORDER - 9

punitive damages issues, Washington courts have afforded greater emphasis to the place where the conduct causing the injury occurred. *See Krammerer v. Western Gear Corp.*, 96 Wash.2d 416 (1981); *Singh*, 161 Wn. App. At 145; *Barr*, 96 Wn.2d at 692.

The issue in this product liability case is which punitive damages law applies. Crown Crafts designed its products in California. The products are manufactured in China, but shipped to California for distribution to U.S. retail locations. Further, Crown Crafts received notice of other infant deaths that occurred in Nojo slings in California. As the Court noted in its previous choice of law analysis for product liability, California's, Virginia's and Connecticut's contacts are evenly balanced. On this issue, California has the most significant contacts because all of the actions that would form the basis for punitive damages occurred there. California's punitive damage laws apply.

### b. Factual Basis for Punitive Damages Reserved for Jury

Having determined that California's punitive damages law applies, the Court now turns to the substance of Crown Crafts' motion for summary judgment. Crown Crafts argues that the Brauns have not established a factual basis for punitive damages. California permits punitive damages when "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. The decision to award punitive damages is usually left to the jury. *Egan v. Mutual Omaha Ins. Co.*, 24 Cal.3d 809, 821 (1979).

When the facts are viewed in the light most favorable to the Brauns, Crown Crafts knew that its product posed a serious risk to infants like Maxwell but chose not to warn users of that risk. On those facts, a reasonable jury could find that punitive damages are warranted. Crown Crafts' Motion for Summary Judgment regarding punitive damages is DENIED.

ORDER - 10

### 3. The Brauns' Motion for Partial Summary Judgment

Lastly, the Brauns move for Partial Summary Judgment on all of Crown Crafts' affirmative defenses. Crown Crafts concedes that the Brauns are entitled to judgment as a matter of law on all affirmative defenses except No. 5, provided that they are allowed to argue affirmative defense nos. 9, 10, 11, and 12 at trial.

Affirmative defenses deny the plaintiff's right to recover, even if the complaint's allegations are true. *See Federal Deposit Ins. Corp. v. Main Hurdman*, 655 F. Supp. 259, 262 (E.D. Cal. 1987); BLACK'S LAW DICTIONARY (9th ed. 2009). Yet in affirmative defense no. 5, Crown Crafts maintains that the Nojo baby sling was not the proximate cause of Maxwell's death. Proximate cause is an element of the Brauns' product liability claim. Affirmative Defenses 9-11 also concern elements of the Brauns' prima facie case. Accordingly, Crown Crafts' affirmative defense nos. 5 and 9-11 are not affirmative defenses, but Crown Crafts will be able to argue them at trial. Affirmative defense No. 12 concerns choice of law, but this Court has already decided that either Connecticut or Washington law governs the product liability claims, and California law governs the punitive damage claims. Accordingly, the Brauns are entitled to summary judgment on all of Crown Crafts' affirmative defenses and the Motion for Partial Summary Judgment is GRANTED.

ORDER - 11

## IV. CONCLUSION

For the reasons stated above, Crown Crafts' Motion to Exclude Dr. Kiesel's Testimony (Dkt. #51) and Motion for Summary Judgment (Dkt. # 48) are DENIED. The Brauns' Motion for Partial Summary (Dkt. #46) is GRANTED.

IT IS SO ORDERED.

Dated this 30th day of January, 2014.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER - 12